**IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT**

**SAYLOR, C.J., EAKIN, BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | | |
|---|---|---|
| PENNSYLVANIA ENVIRONMENTAL DEFENSE FOUNDATION, | : | No. 10 MAP 2015 |
| | : | |
| | : | Appeal from the Order of the |
| Appellant | : | Commonwealth Court at No. 228 MD |
| | : | 2012 dated January 7, 2015 |
| | : | |
| v. | : | ARGUED: March 9, 2016 |
| | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| AND GOVERNOR OF PENNSYLVANIA, | : | |
| TOM WOLF, IN HIS OFFICIAL CAPACITY | : | |
| AS GOVERNOR, | : | |
| | : | |
| Appellees | : | |

**OPINION**

**JUSTICE DONOHUE**                    **DECIDED: June 20, 2017**

In 1971, by a margin of nearly four to one, the people of Pennsylvania ratified a proposed amendment to the Pennsylvania Constitution's Declaration of Rights, formally and forcefully recognizing their environmental rights as commensurate with their most sacred political and individual rights. Article I, Section 27 of the Pennsylvania Constitution provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, § 27. In this case, we examine the contours of the Environmental Rights Amendment in light of a declaratory judgment action brought by the Pennsylvania Environmental Defense Foundation ("Foundation"), an environmental advocacy entity, challenging, inter alia, the constitutionality of statutory enactments relating to funds generated from the leasing of state forest and park lands for oil and gas exploration and extraction. Because state parks and forests, including the oil and gas minerals therein, are part of the corpus of Pennsylvania's environmental public trust, we hold that the Commonwealth, as trustee, must manage them according to the plain language of Section 27, which imposes fiduciary duties consistent with Pennsylvania trust law. We further find that the constitutional language controls how the Commonwealth may dispose of any proceeds generated from the sale of its public natural resources. After review, we reverse in part, and vacate and remand in part, the Commonwealth Court's order granting summary relief to the Commonwealth and denying the Foundation's application for summary relief.

## I. **History and Enactment of the Environmental Rights Amendment**

Section 27 contains an express statement of the rights of the people and the obligations of the Commonwealth with respect to the conservation and maintenance of our public natural resources. In *Robinson Township v. Commonwealth*, 83 A.3d 901 (Pa. 2013) (plurality), a plurality of this Court carefully reviewed the reasons why the Environmental Rights Amendment was necessary, the history of its enactment and ratification, and the mischief to be remedied and the object to be attained. At the outset of this opinion, we reiterate this historical background, which serves as an important reminder as we address the issues presented in the present case:

It is not a historical accident that the Pennsylvania Constitution now places citizens' environmental rights on par with their political rights. Approximately three and a half centuries ago, white pine, Eastern hemlock, and mixed hardwood forests covered about 90 percent of the Commonwealth's surface of over 20 million acres. Two centuries later, the state experienced a lumber harvesting industry boom that, by 1920, had left much of Pennsylvania barren. "Loggers moved to West Virginia and to the lake states, leaving behind thousands of devastated treeless acres," abandoning sawmills and sounding the death knell for once vibrant towns. Regeneration of our forests (less the diversity of species) has taken decades.

Similarly, by 1890, "game" wildlife had dwindled "as a result of deforestation, pollution and unregulated hunting and trapping." As conservationist John M. Phillips wrote, "In 1890, the game had practically disappeared from our state.... We had but few game laws and those were supposed to be enforced by township constables, most of whom were politicians willing to trade with their friends the lives of our beasts and birds in exchange for votes." In 1895, the General Assembly created the Pennsylvania Game Commission and, two years later, adopted a package of new game laws to protect endangered populations of deer, elk, waterfowl, and other game birds. Over the following decades, the Game Commission sought to restore populations of wildlife, by managing and restocking species endangered or extinct in Pennsylvania, establishing game preserves in state forests, and purchasing state game lands. Sustained efforts of the Game Commission over more than a century (coupled with restoration of Pennsylvania's forests) returned a bounty of wildlife to the Commonwealth.

The third environmental event of great note was the industrial exploitation of Pennsylvania's coalfields from the middle of the nineteenth well into the twentieth century. During that time, the coal industry and the steel industry it powered were the keystone of Pennsylvania's increasingly industrialized economy. The two industries provided employment for large numbers of people and delivered tremendous opportunities for small and large investors. "[W]hen coal was a reigning monarch," the industry operated "virtually unrestricted" by either the state or federal government. The result, in the opinion of many, was devastating to the natural environment of the coal-rich

regions of the Commonwealth, with long-lasting effects on human health and safety, and on the esthetic beauty of nature. These negative effects include banks of burning or non-burning soft sooty coal and refuse; underground mine fires; pollution of waters from acid mine drainage; subsidence of the soil; and landscapes scarred with strip mining pits and acid water impoundments. In the mid–1960s, the Commonwealth began a massive undertaking to reclaim over 250,000 acres of abandoned surface mines and about 2,400 miles of streams contaminated with acid mine drainage, which did not meet water quality standards. The cost of projects to date has been in the hundreds of millions of dollars, and the Department of Environmental Protection has predicted that an estimated 15 billion dollars is in fact necessary to resolve the problem of abandoned mine reclamation alone. *Id.*

The overwhelming tasks of reclamation and regeneration of the Commonwealth's natural resources, along with localized environmental incidents (such as the 1948 Donora smog tragedy in which twenty persons died of asphyxiation and 7,000 persons were hospitalized because of corrosive industrial smoke; the 1959 Knox Mine disaster in which the Susquehanna River disappeared into the Pittston Coal Vein; the 1961 Glen Alden mine water discharge that killed more than 300,000 fish; and the Centralia mine fire that started in 1962, is still burning, and led to the relocation of all residents in 1984) has led to the gradual enactment of statutes protecting our environment. The drafters of the Environmental Rights Amendment recognized and acknowledged the shocks to our environment and quality of life:

> We seared and scarred our once green and pleasant land with mining operations. We polluted our rivers and our streams with acid mine drainage, with industrial waste, with sewage. We poisoned our 'delicate, pleasant and wholesome' air with the smoke of steel mills and coke ovens and with the fumes of millions of automobiles. We smashed our highways through fertile fields and thriving city neighborhoods. We cut down our trees and erected eyesores along our roads. We uglified our land and we called it progress.

1970 Pa. Legislative Journal–House at 2270 (quoting anonymous 1698 description of Penn's Woods air).

With these events in the recent collective memory of the General Assembly, the proposed Environmental Rights Amendment received the unanimous assent of both chambers during both the 1969–1970 and 1971–1972 legislative sessions. Pennsylvania voters ratified the proposed amendment of the citizens' Declaration of Rights on May 18, 1971, with a margin of nearly four to one, receiving 1,021,342 votes in favor and 259,979 opposed.

The decision to affirm the people's environmental rights in a Declaration or Bill of Rights, alongside political rights, is relatively rare in American constitutional law. In addition to Pennsylvania, Montana and Rhode Island are the only other states of the Union to do so. *See* Pa. Const. art. I, § 27 (1971); Mt. Const. art. II, § 3 (1889); R.I. Const. art. I, § 17 (1970). Three other states—Hawaii, Illinois, and Massachusetts—articulate and protect their citizens' environmental rights in separate articles of their charters. *See* Hi. Const. art. XI, §§ 1, 9 (1978); Ill. Const. art. XI, §§ 1, 2 (1971–72); Ma. Const. amend. 49 (1972). Of these three states, Hawaii and Illinois, unlike Pennsylvania, expressly require further legislative action to vindicate the rights of the people. By comparison, other state charters articulate a "public policy" and attendant directions to the state legislatures to pass laws for the conservation or protection of either all or enumerated natural resources. *See, e.g.,* Ak. Const. art. VIII, §§ 1–18 (1959); Colo. Const. art. XXVII, § 1 (1993); La. Const. art. IX, § 1 (1974); N.M. Const. art. XX, § 21 (1971); N.Y. Const. art. XIV, §§ 1–5 (1941); Tx. Const. art. XVI, § 59 (1917); Va. Const. art. XI, §§ 1–4 (1971). Some charters address the people's rights to fish and hunt, often qualified by the government's right to regulate these activities for the purposes of conservation. *See, e.g.,* Ky. Const. § 255A (2012); Vt. Const. Ch. II, § 67 (1777); Wi. Const. art. I, § 26 (2003). Still other state constitutions simply authorize the expenditure of public money for the purposes of targeted conservation efforts. *See, e.g.,* Or. Const. art. IX–H, §§ 1–6 (1970); W.V. Const. art. VI, §§ 55, 56 (1996). Finally, many of the remaining states do not address natural resources in their organic charters at all. *See, e.g.,* Nv. Const. art. I, § 1 *et seq.*

That Pennsylvania deliberately chose a course different from virtually all of its sister states speaks to the Commonwealth's experience of having the benefit of vast natural resources whose virtually unrestrained exploitation, while initially a boon to investors, industry, and citizens, led to destructive and lasting consequences not only for the environment but also for the citizens' quality of life. Later generations paid and continue to pay a tribute to early uncontrolled and unsustainable development financially, in health and quality of life consequences, and with the relegation to history books of valuable natural and esthetic aspects of our environmental inheritance. The drafters and the citizens of the Commonwealth who ratified the Environmental Rights Amendment, aware of this history, articulated the people's rights and the government's duties to the people in broad and flexible terms that would permit not only reactive but also anticipatory protection of the environment for the benefit of current and future generations. Moreover, public trustee duties were delegated concomitantly to all branches and levels of government in recognition that the quality of the environment is a task with both local and statewide implications, and to ensure that all government neither infringed upon the people's rights nor failed to act for the benefit of the people in this area crucial to the well-being of all Pennsylvanians.

*Id.* at 960-63 (footnotes and some citations omitted).

## II. Factual and Procedural Background of the Present Case

While the issues in this case arise from the recent leasing of Commonwealth forest and park lands for Marcellus Shale gas extraction, the Commonwealth has a history of leasing its land to private parties for oil and gas exploration dating back to 1947. *Pa. Envtl. Def. Found. v. Com.*, 108 A.3d 140, 143 (Pa. Cmwlth. 2015) ("*PEDF*"); *see also* Prelim. Inj. Hr'g Ex. R-8 at 35 (Governor's Marcellus Shale Advisory Commission Report dated July 22, 2011). In 1955, the Legislature enacted the Oil and Gas Lease Fund Act ("Lease Fund Act"), 71 P.S. §§ 1331-1333, requiring "[a]ll rents and royalties from oil and gas leases" of Commonwealth land to be deposited in the "Oil

and Gas Lease Fund" ("Lease Fund") to be "exclusively used for conservation, recreation, dams, or flood control or to match any Federal grants which may be made for any of the aforementioned purposes." 71 P.S. § 1331.[1]  When enacted, the Lease Fund Act further provided the Secretary of Forests and Waters with the discretion "to determine the need for and the location of any project authorized." 71 P.S. § 1332. Additionally, the Lease Fund Act provided that "[a]ll the moneys from time to time paid"

---

[1]  In its entirety, the Oil and Gas Lease Fund Act provides as follows:

§ 1331. Source and use of fund

All rents and royalties from oil and gas leases of any land owned by the Commonwealth, except rents and royalties received from game and fish lands, shall be placed in a special fund to be known as the "Oil and Gas Lease Fund" which fund shall be exclusively used for conservation, recreation, dams, or flood control or to match any Federal grants which may be made for any of the aforementioned purposes.

§ 1332. Need for and location of projects; acquisition of lands

It shall be within the discretion of the Secretary of Forests and Waters to determine the need for and the location of any project authorized by this act. The Secretary of Forests and Waters shall have the power to acquire in the name of the Commonwealth by purchase, condemnation or otherwise such lands as may be needed.

§ 1333. Appropriation

All the moneys from time to time paid into the "Oil and Gas Lease Fund" are specifically appropriated to the Department of Forests and Waters to carry out the purposes of this act. 71 P.S. §§ 1331-1333. As noted *infra*, the Department of Forests and Waters has been replaced by the Pennsylvania Department of Conservation and Natural Resources (DCNR) for purposes of the Lease Fund Act, see 71 P.S. § 1340.304(c).

into the Fund "are specifically appropriated to the Department of Forests and Waters to carry out the purposes of this act." 71 P.S. § 1333.

In 1995, the Legislature enacted the Conservation and Natural Resources Act ("CNRA"), which created the Pennsylvania Department of Conservation and Natural Resources ("DCNR") as a "cabinet-level advocate" for the State parks, forests, and other natural resources. 71 P.S. § 1340.101(b)(1). Referencing the Environmental Rights Amendment, Article I, Section 27, of the Pennsylvania Constitution, the CNRA indicates that the prior "structure of the Department of Environmental Resources impede[d] the Secretary of Environmental Resources from devoting enough time, energy and money to solving the problems facing our State parks and forests," such that the state parks and forests had "taken a back seat to other environmental issues . . . ." 71 P.S. § 1340.101(a)(7), (8).

The CNRA sets forth the DCNR's primary mission as follows:

> [T]o maintain, improve and preserve State parks, to manage State forest lands to assure their long-term health, sustainability and economic use, to provide information on Pennsylvania's ecological and geologic resources and to administer grant and technical assistance programs that will benefit rivers conservation, trails and greenways, local recreation, regional heritage conservation and environmental education programs across Pennsylvania.

71 P.S. § 1340.101(b)(1). To pursue this mission, the DCNR is "empowered to make and execute contracts or leases in the name of the Commonwealth for the mining or removal of any valuable minerals that may be found in State forests" if the DCNR determines that it "would be for the best interests of this Commonwealth." 71 P.S. § 1340.302(a)(6). Moreover, the DCNR replaced the Department of Forests and Waters as the relevant entity for purposes of the Lease Fund. 71 P.S. § 1340.304.

Accordingly, the CNRA altered the Lease Fund to provide that "all moneys" paid in to the Lease Fund were "specifically appropriated to" the DCNR. 71 P.S. § 1333.

In August 2008, after conducting an environmental review,[2] DCNR began its first foray into the Marcellus Shale natural gas play[3] by approving a lease sale of 74,000 acres ("2008 Leases"). *PEDF*, 108 A.3d at 143-44. The leases generated funds in the form of rents and royalties. The rents were comprised of annual rental fees, an example of which ranged from $20-35 per acre, in addition to large initial "bonus payments" ranging in the millions of dollars. *Id.* at 144 (citing Prelim. Inj. Hr'g Ex. R-1). In addition, the leases further provided for royalties when gas is extracted, with the payment based upon the amount of marketable gas extracted. *Id.* The Marcellus Shale leases dramatically increased the money flowing into the Lease Fund. Indeed, the cumulative proceeds from Commonwealth oil and gas leases from 1947-2008 totaled $165 million, where the oil and gas proceeds in 2009 alone exceeded $167 million, the

---

[2] The DCNR's findings were published and entitled, "August 2008 Oil and Gas Lease Sale State Forest Environmental Review." Prelim. Inj. Hr'g Ex. R-5. The DCNR summarized its conclusions:

> This environmental review is based on the [Bureau of Forestry's] deliberations on the scope, potential impacts and benefits of these deep gas plays. Based on these deliberations, the [DCNR] decided to pursue this opportunity under a portion of the State Forests where our management protocols will support natural gas exploration and development as well as satisfy our legal mandates to offer State Forest land for this purpose.

*Id.* at 2 (unnumbered).

[3] The U.S. Energy Information Administration defines a "play" as "[a] set of known or postulated oil and gas accumulations sharing similar geologic, geographic, and temporal properties, such as source rock, migration pathway, timing, trapping mechanism, and hydrocarbon type." U.S. Energy Information Administration Glossary, http://www.eia.gov/tools/glossary/index.cfm (last visited June 15, 2017).

bulk of which derived from the initial bonus payments (which are categorized under the lease terms as rental payments) from the 2008 Leases. Prelim. Inj. Hr'g Ex. R-14 at 200-201 ("2014 Shale Gas Monitoring Report").

Following the 2008 Leases, the DCNR "decided not to enter into further leases for natural gas extraction on State lands pending study of the 'Marcellus play' and development within the 660,000 acres of land already leased within the Marcellus Shale region," which included previously leased mineral rights and lands that were not owned by the Commonwealth.[4] *PEDF*, 108 A.3d at 144. The former head of the DCNR testified that "we felt strongly that[,] until we could further develop and monitor what was going on[,] … we believed there should be no further gas leasing because we were going to be watching a tremendous amount of gas activity on the state forest for the next 50 years." Prelim. Inj. Hr'g. Notes of Testimony, 5/28/2015, at 36. Notwithstanding this concern, the DCNR received substantial pressure, as described below, between 2008 and 2014 from the executive and legislative branches to lease more state land as a means to reduce the substantial shortfalls in Pennsylvania's general budgets.

During the 2009-10 budget process, the Legislature added Article XVI-E to the Fiscal Code addressing Marcellus Shale leasing ("2009 Fiscal Code Amendments"). Following a definitional section, the article addresses appropriations to the Lease Fund:

> Notwithstanding any other provision of law and except as provided in section 1603-E [providing for an annual appropriation to DCNR of up to $50 million of royalties], no money in the [Lease Fund] from royalties may be expended unless appropriated or transferred to the General Fund by the General Assembly from the fund. In making

---

[4] The acreage amounts utilized by the parties are not entirely consistent. The specific number of acres, however, is irrelevant to the issues before this Court.

appropriations, the General Assembly shall consider the adoption of an allocation to municipalities impacted by a Marcellus well.

72 P.S. § 1602-E. This provision wrought a dramatic change in the flow of royalties from the Lease Fund. While Section 1333 of the Lease Fund Act previously provided for the automatic appropriation of "all moneys" (which would include both rents and royalties) paid into the Lease Fund to be appropriated to the DCNR, the newly enacted Section 1602-E granted the General Assembly authority over the royalties in the Lease Fund (other than Section 1603-E's $50 million annual appropriation to the DCNR) by providing that the "royalties may not be expended unless appropriated or transferred to the General Fund by the General Assembly." *Id.*

The next provision of the 2009 Fiscal Code Amendments, Section 1603-E,[5] limits the DCNR's annual allocation of royalties to an amount "up to $50 million." While $50 million was substantially greater that any pre-2009 royalty receipts, it was not guaranteed and also functions to limit the percentage of the Lease Fund royalties directed to the DCNR, which is particularly relevant as the DCNR had anticipated

---

[5]  72 P.S. § 1603-E. Department of Conservation and Natural Resources

> Subject to the availability of money in the fund following transfers, up to $50,000,000 from the fund from royalties shall be appropriated annually to the [DCNR] to carry out the purposes set forth in the act of December 15, 1955 (P.L. 865, No. 256), entitled "An act requiring rents and royalties from oil and gas leases of Commonwealth land to be placed in a special fund to be used for conservation, recreation, dams, and flood control; authorizing the Secretary of Forests and Waters to determine the need for and location of such projects and to acquire the necessary land." The [DCNR] shall give preference to the operation and maintenance of State parks and forests.

72 P.S. § 1603-E (footnote deleted).

receiving the full amount of the rents and royalties to allow it to oversee the rapid expansion of drilling on state land when it decided to enter into the 2008 Leases. Additionally, while the Lease Fund Act requires that the funds generated by leasing be "exclusively used for conservation, recreation, dams, or flood control or to match [related] Federal grants," 71 P.S. § 1331, the newly-enacted Section 1603-E designates that preference be given instead "to the operation and maintenance of State parks and forests." 72 P.S. § 1603-E.

Section 1604-E of the 2009 Fiscal Code Amendments also required a transfer of $60 million in fiscal year 2009-2010 from the Lease Fund to the General Fund, which was not restricted to conservation purposes. 72 P.S. § 1604-E.[6] Finally, the Supplemental General Appropriations Act of 2009 directed a transfer of $143 million from the Lease Fund to the General Fund. Act of Oct. 9, 2009, P.L. 779, No. 10A, § 1912.

Thereafter, the DCNR abandoned its self-imposed moratorium on leasing additional state land for Marcellus Shale development "as a direct result of certain line items contained within the budget agreement and fiscal code for FY 2009-10." Prelim. Inj. Hr'g Ex. R-6 at 5 (unnumbered) (FY 2009-2010 Oil & Gas Lease Sale State Forest Environmental Review). After again conducting an environmental review,[7] the DCNR leased approximately 32,000 acres of state forest land in January 2010 ("January 2010

---

[6]  72 P.S. § 1604-E provides, "Notwithstanding section 1603-E or any other provision of law, in fiscal year 2009-2010 the amount of $60,000,000 shall be transferred from the fund to the General Fund." 72 P.S. § 1604-E

[7]  The DCNR's November 2009 review was published as "FY 2009-10 Oil & Gas Lease Sale State Forest Environmental Review." Prelim. Inj. Hr'g Ex. R-6.

Leases"). Although, prior to the lease sale, the DCNR Secretary expressed significant concern regarding further leasing,[8] the DCNR, in its published environmental review, concluded that "the impending [lease] sale still meets the Bureau's management guidelines and protocols." *Id.*

Again, following the January 2010 leases, the DCNR intended to halt any further leasing to allow study of the current leases and to avoid overextending its ability to manage them. Nevertheless, due to pressure from the Governor and pending budget transfers, the DCNR leased an additional 33,000 acres in May 2010 ("May 2010 Leases") to generate funds after conducting an environmental review.[9] A few months later, the General Assembly enacted an appropriation for Fiscal Year 2010-2011 transferring $180 million from the Lease Fund to the General Fund.[10]

Just before leaving office in January 2011, Governor Rendell signed an executive order imposing a moratorium on future leasing of state forest and park lands for oil and gas development, finding that further leasing would "jeopardize DCNR's ability to fulfill its duty to conserve and maintain this public natural resource." Prelim. Inj. Hr'g Ex. P-8 at 2.

---

[8] *See* Prelim. Inj. Hr'g Ex. P-3 (Letter of DCNR Secretary Michael DiBerardinis to Governor Edward Rendell, dated March 27, 2009).

[9] The DCNR's review was published as "May 2010 Oil & Gas Lease Offering State Forest Environmental Review." Prelim. Inj. Hr'g Ex. R-7. The DCNR stated that the lease proposal "seeks to minimize environmental and social impacts while returning the mandated $180 million needed for the Commonwealth budget." *Id.* at 1 (unnumbered). The DCNR further concluded that the lease sale "conformed to the Bureau's stated policy and goals." *Id.* at 5.

[10] In 2010, 72 P.S. § 1605-E, entitled "Additional transfers" provided, "Notwithstanding section 1603-E or any other provision of law, in fiscal year 2010-2011, the amount of $180,000,000 shall be transferred from the fund to the General Fund."

For the first three years of Governor Corbett's administration, the Fiscal Code was not amended to provide transfers from the Lease Fund to the General Fund. Instead, the General Appropriations Act for 2011 and 2012 provided appropriations to the DCNR from both the General Fund and the Lease Fund (specifically from royalties), in addition to the up to $50 million in royalties provided annually by Section 1603-E of the 2009 Fiscal Code Amendments and the continued flow of all rental fees from oil and gas leases pursuant to Section 1333 of the Lease Fund Act. *PEDF*, 108 A.3d at 148-49. The 2013 General Appropriations Act decreased the appropriation to the DCNR from the General Fund and increased the appropriation from the Lease Fund to the DCNR, resulting in a larger portion of monies from the Lease Fund being used to pay for the DCNR's operational expenses, which had previously been funded by the General Fund, and thus reduced the amount of monies available for the DCNR's conservation activities. *Id.* at 149.

Although the first few years of the Corbett administration did not witness appropriations from the Lease Fund directly to the General Fund, Act 13 of 2012, which amended the Lease Fund Act, required other transfers from the Lease Fund. Specifically, Act 13 created the Marcellus Legacy Fund, which was funded in part by fees on unconventional wells but also by annual appropriations from the Lease Fund in increasing amounts beginning with $20 million in 2013 and rising to $50 million for all years after 2015. 58 Pa.C.S. §§ 2315(a.1), 2505.[11] The monies in the Marcellus

---

[11] It is unclear whether the transfers from the Lease Fund to the Marcellus Legacy Fund derive from royalties, rents, bonus bid payments, or from some combination of the three sources.

Legacy Fund are earmarked for the Environmental Stewardship Fund and the Hazardous Sites Cleanup Fund, providing capital for projects not controlled by the DCNR. *Id.*

In May 2014, Governor Corbett modified the moratorium banning the leasing of State lands and instead forbade any leasing that "would result in additional surface disturbances on state forest or state park lands." Prelim. Inj. Hr'g Ex. P-8 at 3. The order further provided that the royalties from the additional leasing would be used to repair the infrastructure of the forest and park lands, to acquire lands of "high conservation value or ecological importance," and to acquire private oil, gas, and mineral rights currently owned by private parties under state surface lands. *Id.*

The 2014-2015 General Appropriations Act again included increased appropriations of royalties from the Lease Fund to the DCNR that were mirrored by decreased appropriations from the General Fund to the DCNR. *PEDF*, 108 A.3d at 151. In 2014, the Fiscal Code was amended again to address Marcellus Shale leasing ("2014 Fiscal Code Amendments"). Specifically, Section 1605-E of the Fiscal Code was amended to provide for an appropriation of $95 million from the Lease Fund to the General Fund. 72 P.S. § 1605-E(b).[12]

The 2014 Fiscal Code Amendments also added specific legislative findings in support of the increased leasing of state land and the transfers of capital from the Lease Fund. These findings postulate that Marcellus Shale leasing "is necessary to obtain the

---

[12] Section 1605-E(b) provides, "Notwithstanding section 1603-E or any other provision of law, in fiscal year 2014-2015, the amount of $95,000,000 shall be transferred from the fund to the General Fund." 72 P.S. § 1605-E. As with Sections 1604-E and 1605-E(a), Section 1605-E(b) does not indicate on its face whether it relates to royalties, rents, or bonus bid payments, or some combination of the three.

revenue necessary to effectuate the . . . General Appropriations Act of 2014." 72 P.S. § 1601.1-E (1). Additionally, the findings state that "[t]he fund is not a constitutional trust." 72 P.S. § 1601.1-E (6). After recognizing that the increase in the Fund was due to the Marcellus Shale development, the Legislature indicates that "[t]he Commonwealth's role as trustee of the public's natural resources is broader and more comprehensive than just conserving the State forest and parks." 72 P.S. § 1601.1-E (7), (8). It further affirmatively instructs that "it is in the best interest of the Commonwealth to lease oil and gas rights in State forests and parks" if the DCNR employs lease protections and best management practices and "maintains a balance of money in the [Lease Fund] to carry out [DCNR's] obligation to protect State forest and park land and other environmental activities." 72 P.S. § 1601.1-E (9)(iii). Finally, the statute provides that transfers from the Fund to the General Fund are permissible if the balance of money in the Fund is "adequate to achieve the purposes" of paragraph nine, 72 P.S. § 1601.1-E (10), which directs the DCNR to make state forest and park land leasing decisions based on **all** the Commonwealth's interests.[13] 72 P.S. § 1601.1-E (9).

---

[13] 72 P.S. § 1601.1-E, entitled "Legislative Findings" includes the following as paragraph 9:

> The General Assembly affirms its intent that:
>
> (i) The [DCNR] should continue the operation of the shale gas monitoring activities program to monitor, evaluate and report the impacts of shale gas activities in State forest and, in consultation with the Governor's Office, utilize data received from ongoing monitoring to adjust its management planning and practices.
>
> (ii) The [DCNR] should consider the State forest and park lands as one of the Commonwealth's interests when considering whether or not to lease additional State forest

(continued…)

Distinguished Professor John C. Dernbach of the Widener University Law School

Environmental Law and Sustainability Center[14] recently summarized the significance of

Fiscal Code amendments for purposes of the claims at bar:

> Three legislative amendments to the state fiscal code between 2008 and 2014 redirected a total of $335 million that would have been used for conservation purposes under the [Lease Fund Act] to the general fund, where it is appropriated for a variety of state government purposes. In addition, the Legislature prevented DCNR from spending any [Lease Fund Act] royalties without prior legislative authorization. Finally, the Legislature began using [Lease Fund] revenue to support the overall budget of DCNR, rather than obtaining that budget money from the general fund and using [Lease Fund] money for conservation purposes related to oil and gas extraction

John C. Dernbach, *The Potential Meanings of a Constitutional Public Trust*, 45 Envtl. L.

463, 488 (2015) (footnotes omitted)).

---

(…continued)

and park lands and determining what is in the best interests of the Commonwealth. Interest involved in decisions relating to leasing State forest and park lands should not be made to the exclusion of all other interests of the Commonwealth.

(iii) Notwithstanding any other law to the contrary, it is in the best interest of the Commonwealth to lease oil and gas rights in State forests and parks if the [DCNR]:

(A) in consultation with the Governor, continues strong and effective lease protections, best management practices and ongoing monitoring programs on the impact of gas operations; and

(B) maintains a balance of money in the fund to carry out the [DCNR's] statutory obligation to protect State forest and park land and other environmental activities.

[14] Writing in support of neither party, Professor Dernbach filed a scholarly *amicus* brief in the case at bar.

Acknowledging the structural changes in the source of the funding, the Commonwealth nevertheless emphasizes that the total annual appropriations to the DCNR from the various sources ranged between $69 million in 2012-2013 to $122 million in 2014-2015 and further observes that the DCNR received approximately fifty percent of the over $926 million in total oil and gas lease revenues accumulated from Fiscal Year 2008-2009 through Fiscal Year 2014-2015 (then-projected). Commonwealth's Brief at 18 (citing Respondent's Cross-Motion for Summary Relief, Exhibit M (Governor's Budget Office Oil and Gas Leasing Revenue and Uses Information dated August 21, 2014)).

### III. Commonwealth Court Proceedings

Appellant, the Foundation, brought a claim in the Commonwealth Court under the fiduciary provisions of the Declaratory Judgment Act against the Commonwealth of Pennsylvania and the Governor, in his official capacity (collectively, "the Commonwealth") regarding the 2009-2015 budget related decisions that resulted in the additional lease sales.[15]  The Foundation contends that these decisions violated the

---

[15] The Declaratory Judgment Act provides in relevant part:

> § 7535. Rights of fiduciaries and other persons
>
> Any person interested, as or through an executor, administrator, trustee, guardian, or other fiduciary, creditor, devisee, legatee, heir, next of kin, or cestui que trust, in the administration of a trust . . . may have a declaration of rights or legal relations in respect thereto:
>
> * * * *
>
> (2) To direct the executors, administrators, or trustees to do or abstain from doing any particular act in their fiduciary capacity.

(continued…)

rights of all Commonwealth citizens conferred by the Environmental Rights Amendment, the CNRA, and the Lease Fund Act. *PEDF*, 108 A.3d at 154. The Foundation filed the initial action in March 2012 and amended the action with regard to subsequent legislation. The case at bar addresses cross-applications for summary relief, which allow a court to grant relief only if a party's "right to judgment is clear and no material issues of fact are in dispute." *Jubelirer v. Rendell*, 953 A.2d 514, 521 (Pa. 2008) (citations omitted).[16]

The Commonwealth Court observed that the Foundation filed a brief in excess of 100 pages raising over twenty issues focused primarily on Section 27's protection of the Commonwealth's natural resources. The court found that some of the issues were inappropriate for decision under the Declaratory Judgment Act (such as issues relating to budget proposals rather than enactments) and dismissed others for failure to join the lessees of the leases, whom the court deemed indispensable parties.[17]

The court narrowed the remaining issues before it to three questions:

> (1) Whether Sections 1602–E and 1603–E of the Fiscal Code, which respectively provide that the General Assembly shall appropriate all royalty monies [of] the Lease Fund and

---

(…continued)
42 Pa.C.S. § 7535.

[16] Shortly after the Commonwealth Court issued its decision, and while the lawsuit was pending, Governor Wolf imposed a moratorium on additional leases of state forest and park land, effective January 29, 2015. *See* Exec. Order: 2015-03 – Leasing of State Forest and State Park Land for Oil and Gas Development, *available at* https://www.governor.pa.gov/executive_orders/executive-order-2015-03-leasing-of-state-forest-and-state-park-land-for-oil-and-gas-development/.

[17] The Commonwealth Court denied the Commonwealth's request for a declaration regarding the Governor's authority to override decisions of the DCNR in regard to oil and gas leasing. *PEDF,* 108 A.3d at 173.

that, subject to availability, up to $50 million of the Lease Fund royalties shall be appropriated to [the] DCNR, violate Article I, § 27;

(2) Whether the General Assembly's transfers/appropriations from the Lease Fund violate Article I, § 27; and

(3) Who within the Commonwealth has the duty and thus bears the responsibility to make determinations with respect to the leasing of State lands for oil and natural gas extraction.

*PEDF*, 108 A.3d at 155.

The Commonwealth Court recognized that the Foundation's challenges to some extent overlapped with legislative policy decisions resulting from the need to balance the state budget. While observing that the review of legislative appropriation decisions is generally outside the authority of the courts, the court opined that the propriety of the use of special fund money, such as money from the Lease Fund, is a legal question subject to judicial review. It further concluded that "a decision to lease Commonwealth property protected by the Constitution and held in trust for the benefit of all current and future Pennsylvanians is an appropriate subject of judicial scrutiny." *Id.*

Initially, the Commonwealth Court recognized that this Court recently addressed Section 27 in *Robinson Township*. The court properly observed that *Robinson Township* was a plurality decision in which former-Chief Justice Castille, joined by Justice Todd and former-Justice McCaffery, wrote expansively on Section 27. Justice Baer concurred on a wholly different ground, while Chief Justice Saylor and former-Justice Eakin wrote in dissent. The Commonwealth Court noted that none of the responsive opinions adopted the plurality's view of Section 27. Thus, the Commonwealth Court found "the plurality's construction of Section 27 persuasive only

to the extent it is consistent with binding precedent from [the Commonwealth Court] and the Supreme Court on the same subject." *PEDF,* 108 A.3d at 156 n.37.

The Commonwealth Court, therefore, determined that its prior decision in *Payne v. Kassab*, 312 A.2d 86 (Pa. Commw. 1973) (*Payne I*), controlled the questions presented in the case at bar, even though the plurality in *Robinson Township* criticized the test announced in *Payne I* as "lack[ing] foundation" in Section 27. *PEDF*, 108 A.3d at 159 (citing *Robinson Twp.*, 83 A.3d 966-67). The Commonwealth Court in *Payne I* set forth a three-part test to determine whether a use of Commonwealth land violated Section 27:

> (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources?
>
> (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum?
>
> (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?

*Id.* at 158 (quoting *Payne I*, 312 A.2d at 94).

Notably, this Court affirmed the judgment in *Payne I* without adopting the three-part test, instead concluding that the "elaborate safeguards" of the challenged statute provided adequate protection such that breach of the trust created by Section 27 would not occur. *Payne v. Kassab*, 361 A.2d 263, 273 (Pa. 1976) (*Payne II*).

A. **Constitutionality of Sections 1602–E and 1603–E of the Fiscal Code under Article I, Section 27**

The Commonwealth Court first addressed the Foundation's challenge that Sections 1602-E and 1603-E of the 2009 Fiscal Code Amendments violated Section 27.

As noted, these provisions altered the status quo which had previously appropriated to the DCNR all monies in the Lease Fund under the Lease Fund Act, 71 P.S. § 1333. The change, the Foundation argued, violated Section 27 because it (1) took away DCNR's ability to use the revenues to mitigate the damage from oil and gas exploration, (2) removed DCNR's ability to act as trustee because the funds were placed in the General Fund, potentially for non-conservation purposes, and (3) eliminated revenues that would otherwise have built the corpus of the Lease Fund to protect Pennsylvania's natural resources. *PEDF*, 108 A.3d at 160.

Looking first to the plain language of Section 1602-E, the Commonwealth Court observed that the section merely transferred control over the royalties (but not the rents) from oil and gas leases from the DCNR to the General Assembly, which, as part of the Commonwealth, was also bound to safeguard the Commonwealth's natural resources under Article I, Section 27. Additionally, the court recognized that Section 1602-E did not change the DCNR's decision making authority regarding the granting of leases. The court held that the provision "does not by itself infringe upon the rights afforded the people" and does not "reflect a failure by the General Assembly to act consistent with its trustee obligations under Article I, Section 27." *Id.* at 161. It further highlighted that the Lease Fund is not a constitutional creation but rather is a special fund created by legislative enactment, which could be altered by subsequent legislative action. *Id.* at 160. Accordingly, the court concluded that the Foundation failed to demonstrate that Section 1602-E "clearly, plainly, and palpably" violated Section 27. *Id.* at 161.

Turning to Section 1603-E of the 2009 Fiscal Code Amendments, which transferred up to $50 million of royalties annually from the Lease Fund to the DCNR, the

Commonwealth Court acknowledged the Foundation's argument that the transfer of the $50 million acted to limit the funding of the DCNR, as it had previously received all royalties from the Lease Fund. The court redefined this challenge as a claim that the transfer did not provide adequate funding for DCNR to protect the Commonwealth's natural resources, as opposed to addressing the Foundation's broader argument that the Commonwealth, specifically Governor Rendell, failed to abide by his various duties as trustee by limiting the funding of the DCNR. *Id.*

The Commonwealth Court reviewed case law addressing constitutional challenges based on inadequate funding of a part of government. *PEDF*, 108 A.3d at 161-66. The Commonwealth Court observed that while this Court has been willing to act to protect the "independence of the judicial branch," the Commonwealth Court has not been willing to intervene in regard to the Legislature's authority to determine the funding of Commonwealth agencies. *Id.* at 161-64 (citing, inter alia, *County of Allegheny v. Commonwealth*, 534 A.2d 760 (Pa. 1987) (holding legislative acts requiring counties to fund the local court system to be unconstitutional) and *Commonwealth ex rel. Carroll v. Tate*, 274 A.2d 193 (Pa. 1971) (addressing court funding in Philadelphia)), 164-66 (citing, inter alia*, Mental Health Association in Pennsylvania v. Corbett*, 54 A.3d 100 (Pa. Cmwlth. 2012) (dismissing challenge based on inadequacy of funding for Department of Public Welfare's mental health and intellectual disability services)).

Reiterating its reluctance to "second guess" the amounts appropriated by the General Assembly to Commonwealth agencies, the Commonwealth Court applied what it viewed as this Court's requirement that a challenger demonstrate that "the amount funded is so inadequate that it impairs the proper functioning" of the DCNR. *Id.* at 166.

It concluded that the Foundation "presented no evidence that the current funding appropriated to the DCNR from all sources is inadequate – i.e., that the funding is so deficient that the DCNR cannot conserve and maintain our State natural resources." *Id.* Accordingly, the court granted the Commonwealth's motion for summary relief, concluding that the Foundation failed to demonstrate that Sections 1602-E and 1603-E violate the Constitution.

B. **Constitutionality of Section 1604-E, Section 1605-E, and other transfers of money from the Lease Fund**

In regard to Sections 1604-E and 1605-E and the other budgetary transfers, *see supra* at 12-15, the Foundation argued that the money generated by oil and gas exploration "must be committed to furthering the purposes, rights, and protections afforded" under Section 27, rather than being intermingled with the General Fund. *Id.* at 167. Considering the constitutional language, the Commonwealth Court held that Section 27 "does not expressly command that all revenues derived from the sale or leasing of the Commonwealth's natural resources must be funneled to those purposes and those purposes only." *Id.* at 168.

The court reiterated that the Lease Fund was merely a statutory special fund, rather than a trust fund, and opined that there was "no constitutional mandate that monies derived from the leasing of State lands for oil and natural gas development be reinvested into the conservation and maintenance of the Commonwealth's public natural resources." *Id.* at 169. Accordingly, the Commonwealth Court again held that the Foundation failed to demonstrate that the Fiscal Code Amendments, General Appropriations Act transfers, and Act 13 transfers from the Lease Fund to the General Fund violate the Environmental Rights Amendment, because funds appeared to be

used for the general "benefit of all the people." *Id.* The court, therefore, denied summary relief to the Foundation, granting in substantial part the Commonwealth's cross-motion for summary relief.[18]

## IV. Analysis

The Foundation filed a direct appeal as of right from the final order of the Commonwealth Court, pursuant to 42 Pa.C.S. § 723(a), raising ten issues. We entertained oral argument to examine the following two overarching issues:

> 1. The proper standards for judicial review of government actions and legislation challenged under the Environmental Rights Amendment, Article I, Section 27 of the Pennsylvania Constitution, in light of *Robinson Township v. Commonwealth*, 83 A.3d 901 (Pa. 2013) (plurality);

---

[18] Sections 1602-E and 1603-E affect the appropriation of royalties to the DCNR, initially re-appropriating all such payments to the General Assembly, before authorizing a transfer of some royalty money back to the DCNR. The Commonwealth Court indicated that Sections 1604-E and 1605-E resulted in the transfer of "bonus payment revenue" (an elevated "first annual rental payment") from the Lease Fund to the General Fund, after forcing DCNR to generate the same through additional leasing. *See PEDF*, 108 A.3d at 146-48; *accord* Foundation's Brief at 76. According to the Foundation, the General Appropriation Act of 2009 also resulted in the transfer of bonus bid payments to the General Fund. *See* Foundation's Brief at 76.

The Commonwealth Court additionally considered, in regard to the Commonwealth's cross-motion for summary relief, whether the Governor or only the DCNR has authority to enter natural gas leases. The court noted that the CNRA provides the DCNR with exclusive authority "to make and execute contracts or leases in the name of the Commonwealth for the extraction of oil and natural gas on State lands and to determine whether doing so is in the best interest of the Commonwealth." *Id.* at 171 (citing 71 P.S. § 1340.302(a)(6)). It, therefore, denied the Commonwealth relief on this point, concluding that the ultimate decision lay with the DCNR, although recognizing that the General Assembly and the Governor could attempt to influence it. *Id.* at 172. Judge Cohn Jubelirer joined the majority opinion with the exception of the section addressing whether the Governor or the DCNR had decision-making authority in regard to future leases, which she deemed advisory, because no future leasing decisions had as of then been made.

2. Constitutionality under Article I, [Section] 27 of Section 1602-E and 1603-E of the Fiscal Code and the General Assembly's transfers/appropriations from the Lease Fund.

Given that we are reviewing the Commonwealth Court's decision on cross-motions for summary relief pursuant to Pa.R.A.P. 1532(b),[19] we may grant relief only if no material questions of fact exist and the right to relief is clear. *See Jubelirer*, 953 A.2d at 521. Additionally, as challenges to the constitutionality of statutes present pure questions of law, our standard of review is de novo, and our scope of review is plenary. See *Robinson Twp.*, 83 A.3d at 943. As with any constitutional challenge to legislation, the challenger bears the heavy burden of demonstrating that the statute "clearly, plainly, and palpably violates the Constitution," as we presume that our sister branches act in conformity with the Constitution. *Stilp v. Commonwealth*, 905 A.2d 918, 939 (Pa. 2006). In interpreting constitutional language, "the fundamental rule of construction which guides [this Court] is that the Constitution's language controls and must be interpreted in its popular sense, as understood by the people when they voted on its adoption." *Ieropoli v. AC&S Corp.,* 842 A.2d 919, 925 (Pa. 2004). As with our interpretation of statutes, if the language of a constitutional provision is unclear, we may be informed by "the occasion and necessity for the provision; the circumstances under which the amendment was ratified; the mischief to be remedied; the object to be attained; and the contemporaneous legislative history." *Robinson Twp.*, 83 A.3d at 945 (citing 1 Pa.C.S. §§ 1921, 1922).

---

[19] Rule 1532(b), entitled "Summary relief," provides as follows: "At any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear." Pa.R.A.P. 1532(b).

A. **Proper Standard of Judicial Review**

The parties, various amici, and the plurality in *Robinson Township* all reject the three-part test developed by the Commonwealth Court in *Payne I* as the appropriate standard for examining Section 27 challenges. The Commonwealth observes that the *Payne I* test has been criticized as "ill-fitted" to the language of Section 27 and as frustrating the development of a "coherent environmental rights jurisprudence." Commonwealth's Brief at 25 (citing *Robinson Township*, 83 A.3d at 964). Similarly, the Foundation urges "the issues in this case do not fit the mold of the *Payne* test crafted by the Commonwealth Court." Foundation's Reply Brief at 5 (discussing the *Robinson Township* plurality's three part criticism of the *Payne* test).[20]

We agree. The *Payne I* test, which is unrelated to the text of Section 27 and the trust principles animating it, strips the constitutional provision of its meaning. *See Robinson Twp.*, 83 A.3d at 967; *see also* Dernbach, *The Potential Meanings of a Constitutional Public Trust*, 45 Envtl. L. 463, 499 (2015). Accordingly, we reject the test

---

[20] In *Robinson Township*, the plurality explained the significant drawbacks of the Commonwealth Court's *Payne* test:

> [T]he test poses difficulties both obvious and critical. First, the *Payne* test describes the Commonwealth's obligations— both as trustee and under the first clause of Section 27—in much narrower terms than the constitutional provision. Second, the test assumes that the availability of judicial relief premised upon Section 27 is contingent upon and constrained by legislative action. And, finally, the Commonwealth Court's *Payne* decision and its progeny have the effect of minimizing the constitutional duties of executive agencies and the judicial branch, and circumscribing the abilities of these entities to carry out their constitutional duties independent of legislative control.

*Robinson Twp.*, 83 A.3d at 967.

developed by the Commonwealth Court as the appropriate standard for deciding Article I, Section 27 challenges.

Instead, when reviewing challenges to the constitutionality of Commonwealth actions under Section 27, the proper standard of judicial review lies in the text of Article I, Section 27 itself as well as the underlying principles of Pennsylvania trust law in effect at the time of its enactment. We must therefore carefully examine the contours of the Environmental Rights Amendment to identify the rights of the people and the obligations of the Commonwealth guaranteed thereunder.

## B. The Contours of Section 27

This is not the first time we have been called upon to address the rights and obligations set forth in the Environmental Rights Amendment. We did so in *Robinson Twp.,* and we rely here upon the statement of basic principles thoughtfully developed in that plurality opinion.[21] To start, the General Assembly derives its power from Article III of the Pennsylvania Constitution which grants broad and flexible police powers to enact laws for the purposes of promoting public health, safety, morals, and the general welfare. *Id.* at 946. These powers, however, are expressly limited by fundamental rights reserved to the people in Article I of our Constitution. *Id.* at 946. Specifically, Section 1 affirms, among other things, that all citizens "have certain inherent and indefeasible rights." *Id.* at 948 (quoting Pa. Const. art. I, § 1). As forcefully pronounced

---

[21] In *Robinson Township,* this Court considered the constitutionality of portions of Act 13 of 2012, which amended the Pennsylvania Lease Fund Act with substantial benefits to the natural gas industry in response to the Marcellus Shale boom. Notably, some of the Foundation's challenges in the case at bar were triggered by separate provisions of Act 13, specifically those provisions that created the Marcellus Legacy Fund. *See* 58 Pa.C.S. §§ 2315(a.1), 2505.

in Section 25, the rights contained in Article I are "excepted out of the general powers of government and shall forever remain inviolate." *Id.* (quoting Pa. Const. art. I, § 25).

Among the "inherent and indefeasible" rights in Article I of the Pennsylvania Constitution are the rights set forth in the Environmental Rights Amendment, which we quote again for ease of discussion:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, § 27. This constitutional provision grants two separate rights to the people of this Commonwealth. The first right is contained in the first sentence, which is a prohibitory clause declaring the right of citizens to clean air and pure water, and to the preservation of natural, scenic, historic and esthetic values of the environment. *Robinson Twp.,* 83 A.3d at 951. This clause places a limitation on the state's power to act contrary to this right, and while the subject of this right may be amenable to regulation, any laws that unreasonably impair the right are unconstitutional. *Id.*

The second right reserved by Section 27, set forth in its second sentence, is the common ownership by the people, including future generations, of Pennsylvania's public natural resources. *Id.* at 954. The "public natural resources" referenced in this second sentence include the state forest and park lands leased for oil and gas exploration and, of particular relevance in this case, the oil and gas themselves. *Id.* at 955; *see also* Pa. L. Journal, 154th General Assembly, No. 118, Reg. Sess., 2271–75 (1970). In a statement offered to the General Assembly in connection with the proposed

Environmental Rights Amendment, Professor Robert Broughton explained that the provision was initially drafted as "Pennsylvania's natural resources, including the air, waters, fish, wildlife, and the public lands and property of the Commonwealth …." but was revised to remove the enumerated list and thereby discourage courts from limiting the scope of natural resources covered. Pa. L. Journal, 154th General Assembly, No. 118, Reg. Sess., 2274 (1970) (Broughton Analysis).[22]

The third clause of Section 27 establishes a public trust, pursuant to which the natural resources are the corpus of the trust, the Commonwealth[23] is the trustee, and the people are the named beneficiaries. *Robinson Twp.,* 83 A.3d at 955-56. The terms "trust" and "trustee" carry their legal implications under Pennsylvania law at the time the amendment was adopted. *See Appeal of Ryder*, 74 A.2d 123, 124 (Pa. 1950) (providing that "words having a precise and well-settled legal meaning must be

---

[22] The sentence was also amended to include the term "public" to indicate that it did not apply to purely private property rights. However, Representative Kury opined that the trust nevertheless applied to "resources owned by the Commonwealth and also to those resources not owned by the Commonwealth, which involve a public interest." Pa. L. Journal, 154th General Assembly, No. 118, Reg. Sess., 2271-72 (1970) (statement by Rep. Kury).

[23] Trustee obligations are not vested exclusively in any single branch of Pennsylvania's government, and instead all agencies and entities of the Commonwealth government, both statewide and local, have a fiduciary duty to act toward the corpus with prudence, loyalty, and impartiality. *See Robinson Twp.,* 83 A.3d at 956-57; *see also* Pa. L. Journal, 154th General Assembly, No. 118, Reg. Sess., 2269, 2271 (1970).

Importantly, in addition to its trustee obligations, the DCNR also has a statutory responsibility "to maintain, improve and preserve State parks, to manage State forest lands to assure their long-term health, sustainability and economic use." *See* 71 P.S. § 1340.101. To pursue this mission, the DCNR is empowered with exclusive authority "to make and execute contracts or leases in the name of the Commonwealth for the mining or removal of any valuable minerals that may be found in State forests" when, and only when, the DCNR determines that doing so is in the best interests of the Commonwealth. 71 P.S. § 1340.302(a)(6).

interpreted" accordingly); *see also Robinson Twp.*, 83 A.3d at 956 (citing Pa.C.S. § 1903). Notably, Professor Broughton explained that the Commonwealth's role was plainly intended to be that of a "trustee," as opposed to "proprietor." *See* Pa. L. Journal, 154th General Assembly, No. 118, Reg. Sess., 2269, 2273 (1970) (Broughton Analysis). As a trustee, the Commonwealth must deal "with its citizens as a fiduciary, measuring its successes by the benefits it bestows upon all its citizens in their utilization of natural resources under law." *Id.* Under Section 27, the Commonwealth may not act as a mere proprietor, pursuant to which it "deals at arms['] length with its citizens, measuring its gains by the balance sheet profits and appreciation it realizes from its resources operations." *Id.*

The *Robinson Township* plurality aptly described the Commonwealth's duties as the trustee of the environmental trust created by the people of Pennsylvania as follows:

> As trustee, the Commonwealth is a fiduciary obligated to comply with the terms of the trust and with standards governing a fiduciary's conduct. The explicit terms of the trust require the government to "conserve and maintain" the corpus of the trust. *See* Pa. Const. art. I, § 27. The plain meaning of the terms conserve and maintain implicates a duty to prevent and remedy the degradation, diminution, or depletion of our public natural resources. As a fiduciary, the Commonwealth has a duty to act toward the corpus of the trust—the public natural resources—with prudence, loyalty, and impartiality.

*Robinson Twp.*, 83 A.3d at 956-57.

Under Pennsylvania trust law, the duty of prudence requires a trustee to "exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property." *In re Mendenhall*, 398 A.2d 951, 953 (Pa. 1979) (quoting

Restatement (Second) of Trusts § 174).[24]  The duty of loyalty imposes an obligation to manage the corpus of the trust so as to accomplish the trust's purposes for the benefit of the trust's beneficiaries.  *See Metzger v. Lehigh Valley Trust & Safe Deposit Co.,* 69 A. 1037, 1038 (Pa. 1908); *see also In re Hartje's Estate*, 28 A.2d 908, 910 (Pa. 1942) (citing Restatement (Second) of Trusts § 186 for the proposition that "the trustee can properly exercise such powers and only such powers as (a) are conferred upon him in specific words by the terms of the trust, or (b) are necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust").  The duty of impartiality requires the trustee to manage the trust so as to give all of the beneficiaries due regard for their respective interests in light of the purposes of the trust.  20 Pa.C.S. § 7773; *Estate of Sewell*, 409 A.2d 401, 402 (Pa. 1979) (citing Restatement (Second) of Trusts § 183).[25]

Pennsylvania's environmental trust thus imposes two basic duties on the Commonwealth as the trustee.  First, the Commonwealth has a duty to prohibit the degradation, diminution, and depletion of our public natural resources, whether these harms might result from direct state action or from the actions of private parties. *Robinson Twp.*, 83 A.3d at 957.  Second, the Commonwealth must act affirmatively via

---

[24] The Uniform Trust Act confirms that the duty to administer with prudence involves "considering the purposes, provisions, distributional requirements and other circumstances of the trust and … exercising reasonable care, skill and caution." 20 Pa.C.S. § 7774.  In furtherance of this duty, the trustee **"**shall keep adequate records of the administration of the trust" and "shall keep trust property separate from the trustee's own property."  20 Pa.C.S. § 7780.

[25] Justice Baer's contention that our holding today "cordons off" hundreds of millions of dollars from other budgetary uses is inaccurate.  *See* Concurring and Dissenting Opinion at 3.  In so contending, Justice Baer addresses a question never raised by the parties and thus not presently before us.

legislative action to protect the environment. *Id.* at 958 (citing *Geer v. Connecticut*, 161 U.S. 519, 534 (1896) (trusteeship for the benefit of state's people implies legislative duty "to enact such laws as will best preserve the subject of the trust, and secure its beneficial use in the future to the people of the state")). Although a trustee is empowered to exercise discretion with respect to the proper treatment of the corpus of the trust, that discretion is limited by the purpose of the trust and the trustee's fiduciary duties, and does not equate "to mere subjective judgment." *Id.* at 978 (citing *Struthers Coal & Coke Co. v. Union Trust Co.*, 75 A. 986, 988 (Pa. 1910); *In re Sparks' Estate*, 196 A. 48, 57 (Pa. Super. 1938)). The trustee may use the assets of the trust "only for purposes authorized by the trust or necessary for the preservation of the trust; other uses are beyond the scope of the discretion conferred, even where the trustee claims to be acting solely to advance other discrete interests of the beneficiaries." *Id.* (citing *Metzger*, 69 A. at 1038); *see also Hartje's Estate*, 28 A.2d at 910 ("giving of [an] unrestricted bond" was "neither 'necessary' nor 'appropriate' to the carrying out of the purposes of the trust; hence, the existence of [trustee's] power to do so by inference must be denied").

The Commonwealth argues that the revenue obtained from the disposition of trust assets need not be returned to the corpus of the trust or otherwise dedicated to trust purposes, for two reasons. First, the Commonwealth contends that the Environmental Rights Amendment is "silent" as to the use of proceeds from the sale of natural resources, and "addresses neither the appropriations process nor funding for conservation purposes." *See* Commonwealth's Brief at 39. This is plainly inaccurate, as Section 27 expressly creates a trust, and pursuant to Pennsylvania law in effect at

the time of enactment, proceeds from the sale of trust assets are part of the corpus of the trust. *See, e.g.*, *McKeown's Estate*, 106 A. 189, 190 (Pa. 1919) ("Being a sale of assets in the corpus of the trust, presumptively all the proceeds are principal… ."). The unavoidable result is that proceeds from the sale of oil and gas from Section 27's public trust remain in the corpus of the trust.[26]

---

[26] The Commonwealth Court posited that "where the drafters of the Pennsylvania Constitution intended to dedicate a tranche of money to a particular purpose, they did so expressly," as in Article VIII, § 11(a) (relating to Motor Licensing Fund) (MVL Fund) and Article VIII, § 16 (relating to Land and Water Conservation and Reclamation Fund) (LWCR Fund). *PEDF*, 108 A.3d at 168 n.46. The Commonwealth urges us to adopt this reasoning, *see* Commonwealth's Brief at 40, but we are unpersuaded. As described herein, the creation of a trust in the Environmental Rights Amendment obviates the need for additional language indicating that funds should be dedicated for a specific purpose. Section 27 itself establishes that the purpose of the trust is to "conserve and maintain" the public natural resources and basic trust principles require that the proceeds from their sale remain part of the corpus. By contrast, the MVL Fund and the LWCR Fund provisions do not contain trust language.

The Commonwealth additionally urges us to adopt a line of reasoning it claims is consistent not with the treatment of trust proceeds under Pennsylvania trust law but, instead, with the "public trust doctrine." *Id.* at 43-45 (discussing the seminal public trust doctrine case, *Illinois Central Railroad Co. v. Illinois*, 146 U.S. 387 (1892), wherein the United States Supreme Court held that Illinois could not divest itself of certain land and water because doing so would deprive the public of its right to the use and enjoyment thereof). The Commonwealth's argument is unavailing.

As an initial matter, *Illinois Central Railroad* has nothing to do with the proper treatment of proceeds from the sale of trust assets. More to the point, while we appreciate that Section 27 establishes a public trust, we also recognize that the "public trust doctrine" does not set forth universally applicable black letter law and that Pennsylvania has no established public trust principles applicable to Section 27. Scholars of public trust law, including Professor Joseph L. Sax – whose article, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471 (1970), is discussed in the legislative history for Section 27 – acknowledge that the "amorphous" public trust concept merely provides a potential tool through which citizens may attempt to develop a comprehensive approach to natural resource management. *Id.* at 474, 546 (presenting a compendium of public trust cases from around the country reflecting legal theories "as diverse as lawyers' imaginations are fertile"); *see also* Commonwealth's Brief at 44 n.22 (citing William H. Rodgers Jr., Handbook on Environmental Law, § 2.16 (continued…)

Second, the Commonwealth insists that the concluding phrase of Section 27, "for the benefit of all the people," confers discretion upon the General Assembly to direct the proceeds from oil and gas development toward **any** uses that benefit all the people of the Commonwealth, even if those uses do nothing to "conserve and maintain" our public natural resources.  Commonwealth's Brief at 41 (citing *PEDF*, 108 A.3d at 168).  We are wholly unconvinced.  The phrase "for the benefit of all of the people" may not be read in isolation and does not confer upon the Commonwealth a right to spend proceeds on general budgetary items.  Pa. Const. art I, § 27.  The Commonwealth's fiduciary duty to "conserve and maintain" our public natural resources is a duty owed to the beneficiaries of the public trust, namely "the people, including generations yet to come," as set forth in the second sentence of Section 27.  *Id.*  The "people," in turn, are those endowed with "a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment," as set forth in the first sentence of Section 27.  *Id.*

Accordingly, the Environmental Rights Amendment mandates that the Commonwealth, as a trustee, "conserve and maintain" our public natural resources in furtherance of the people's specifically enumerated rights.  Thus understood in context of the entire amendment, the phrase "for the benefit of all the people" is unambiguous

---

(…continued)
(West Pub. Co. 1977), for the proposition that "[a]ny attempt at a shorthand statement of the principles of public trust doctrine must come with a disclaimer: the constitutional and legislative variations among the states approach the infinite…").

At most, the public trust doctrine provides a framework for states to draft their own public trust provisions, which (like many trust instruments) will ultimately be interpreted by the state courts.  In Pennsylvania, established private trust principles provide this Court with the necessary tools to properly interpret the trust created by Section 27.

and clearly indicates that assets of the trust are to be used for conservation and maintenance purposes. *See Robinson Twp.*, 83 A.3d at 957 (holding that the "explicit terms of the trust require the government to 'conserve and maintain' the corpus of the trust"). Only within those parameters, clearly set forth in the text of Section 27, does the General Assembly, or any other Commonwealth entity, have discretion to determine the public benefit to which trust proceeds – generated from the sale of trust assets – are directed.

By arguing that proceeds obtained from the sale of our natural resources are not part of the corpus of the trust, the Commonwealth improperly conceives of itself as a mere proprietor of those public natural resources, rather than as a trustee. In the Commonwealth's view, it may dispose of our public natural resources as it so chooses and for any purpose it so conceives, so long as such disposition broadly benefits the public (apparently without regard to "generations yet to come"). *See* Commonwealth's Brief at 45. As such, it urges us to substantially diminish its fiduciary obligation to prevent and remedy the degradation of our natural resources. We decline to do so.

The Foundation contends that all revenues generated by oil and gas leases remain in the corpus of the trust. We are without sufficient advocacy to rule on the correctness of this proposition. We note again that Pennsylvania trust law dictates that proceeds from the sale of trust assets are trust principal and remain part of the corpus of the trust. *McKeown's Estate*, 106 A. at 190. When a trust asset is removed from the trust, all revenue received in exchange for the trust asset is returned to the trust as part of its corpus. *See Bolton v. Stillwagon*, 190 A.2d 105, 109 (Pa. 1963) (explaining that when "the relation of trustee and [beneficiary] has once been established as to certain

property in the hands of the trustee, no mere change of trust property from one form to another will destroy the relation"). As a result, royalties – monthly payments based on the gross production of oil and gas at each well – are unequivocally proceeds from the sale of oil and gas resources. *See* Petitioner's Brief for Summary Judgment, Pet. Ex. X. They are part of the corpus of the trust and the Commonwealth must manage them pursuant to its duties as trustee.

Conversely, it is less clear how to categorize other revenue streams. *See generally In re Rosenblum's Estate*, 328 A.2d 158, 163 (Pa. 1974) (in a case not involving oil and gas leases, holding that rents from realty held by a trust have traditionally been treated as income (and payable directly to the trust's beneficiaries) rather than principal).[27] *See also In re McKeown's Estate*, 106 A. at 190; Restatement (Second) of Trusts § 233; 20 Pa.C.S. § 8145. For example, the record on appeal is undeveloped regarding the purpose of up-front bonus bid payments, and thus no factual basis exists on which to determine how to categorize this revenue. While we recognize that the leases designate these payments, among others, as "rental payments," such a classification does not shed any light on the true purpose of the payment, e.g., rental of a leasehold interest in the land, payment for the natural gas extracted, or some other purpose. In construing Sections 1604-E and 1605-E, to the extent that the lease agreements reflect the generation of revenue streams for amounts other than for the purchase of the oil and gas extracted, it is up to the Commonwealth Court, in the first

---

[27] Unlike a sale or other disposition that deprives the trust of any further benefit from the trust asset, at the end of a rental period, the trust retains the trust asset in its entirety in its corpus.

instance and in strict accordance and fidelity to Pennsylvania trust principles, to determine whether these funds belong in the corpus of the Section 27 trust.

In this regard, it must be remembered that the Commonwealth, as trustee, has a constitutional obligation to negotiate and structure leases in a manner consistent with its Article 1, Section 27 duties. Oil and gas leases may not be drafted in ways that remove assets from the corpus of the trust or otherwise deprive the trust beneficiaries (the people, including future generations) of the funds necessary to conserve and maintain the public natural resources.

On remand, the parties should be given the opportunity to develop arguments concerning the proper classification, pursuant to trust law, of any payments called "rental payments" under the lease terms. To the extent such payments are consideration for the oil and gas that is extracted, they are proceeds from the sale of trust principal and remain in the corpus. These proceeds remain in the trust and must be devoted to the conservation and maintenance of our public natural resources, consistent with the plain language of Section 27.

### C. Need for Implementing Legislation

The Foundation contends that Section 27 is self-executing, based in part on the plurality opinion in *Robinson Township*. Foundation's Brief at 49-50. While the Commonwealth does not take a position on this issue, the Republican Caucus, as amicus, argues that Section 27 is not self-executing. Republican Caucus' Brief at 48-60. It analyzes decisions from others states regarding their environmental rights amendments and observes that, while a few states have specific language dictating that

the amendment is self-executing, no state has read the language of the amendment as self-executing when the language does not explicitly so provide. *Id.* at 56-60.

The plurality in *Robinson Township* recognized that our prior case law has not resolved the issue of whether Section 27 is self-executing or whether it requires implementing legislation to be effective, at least in regard to an attempt to enforce the people's rights against owners of private property.[28] *Robinson Township*, 83 A.3d at 964-65; *see also* Dernbach, *The Potential Meanings of a Constitutional Public Trust*, 45 Envtl. L. at 474-75.

Although refusing to speak to whether the right was self-executing for purposes of enforcement against private property, this Court in *Payne II*, nevertheless concluded that the trust provisions in the second and third sentences of Section 27 do not require legislative action in order to be enforced against the Commonwealth in regard to public property. In *Payne II*, we stated:

> There can be no question that the Amendment itself declares and creates a public trust of public natural

---

[28] This question, regarding whether Section 27 was self-executing in regard to private property, divided the Court in *Commonwealth v. National Gettysburg Battlefield*, 311 A.2d 588 (Pa. 1973), where the Commonwealth attempted to enjoin the owners of property adjoining the Gettysburg battlefield from constructing an observation tower claiming that the tower would violate the people's right to the historic and aesthetic values of the site. In a plurality opinion, two justices concluded that the Section 27 claim should be dismissed because the provision required legislative action to be effective, *id.* at 595; one justice concurred with the dismissal without opinion, *id.*; two justices found that the Commonwealth's claim failed on the merits, while acknowledging the Commonwealth's ability to act as trustee (presumably without further legislative action), *id.* at 595-96; and two justices would have granted the injunction based on Section 27, specifically finding the provision to be self-executing, *id.* at 597. As noted in *Robinson Township*, this Court previously misstated that a plurality of the justices in Gettysburg concluded that the Section 27 was not self-executing in *United Artists Theater Circuit, Inc. v. City of Philadelphia,* 635 A.2d 612, 620 (Pa. 1993), when in fact only two justices specifically found it to require legislative action. *Robinson Twp.*, 83 A.3d at 940.

resources for the benefit of all the people (including future generations as yet unborn) and that the Commonwealth is made the trustee of said resources, commanded to conserve and maintain them. No implementing legislation is needed to enunciate these broad purposes and establish these relationships; the [A]mendment does so by its own *ipse dixit.*

*Payne II*, 361 A.2d at 272.

Former Chief Justice Castille echoed this concept in the *Robinson Township* plurality, concluding that the Commonwealth's obligations as trustee "create a right in the people to seek to enforce the obligations." *Robinson Township*, 83 A.3d at 974.[29] Accordingly, we re-affirm our prior pronouncements that the public trust provisions of Section 27 are self-executing.

### D. Foundation's Challenges

In the Commonwealth Court, the Foundation sought declarations that the Commonwealth has certain duties as constitutional trustee and that various acts or decisions by the Governor and General Assembly violated those constitutional duties. As noted, the challenged acts and decisions primarily relate to the propriety of the Commonwealth's use of revenue generated from oil and gas leases for purposes not authorized by Section 27. Also implicated is the propriety of the Commonwealth's decision-making process with respect to leasing state land. *See* Foundation's Reply Brief at 13 (arguing that leasing and selling the state park and forest land, and the oil and gas thereon for the purpose of generating revenue for the General Fund is improper because balancing the budget "is not one of the purposes of the trust"). Having

---

[29] We additionally find support in Section 27's legislative history, in which Professor Broughton opined that the Amendment "would immediately create rights to prevent the government (state, local, or an authority) from taking positive action which unduly harms environmental quality." Legislative Journal–House at 2281 (Broughton Analysis).

determined that proceeds representing payment for extracted oil and gas remain as part of the corpus of our environmental public trust, and that royalties are unquestionably such proceeds, we are able to make specific rulings with respect to only some of the challenged legislation.

Sections 1602-E and 1603-E relate exclusively to royalties. On their face, these amendments lack any indication that the Commonwealth is required to contemplate, let alone reasonably exercise, its duties as the trustee of the environmental public trust created by the Environmental Rights Amendment. The Commonwealth itself readily acknowledges that revenue generated by oil and gas leases is now spent in a multitude of ways entirely unrelated to the conservation and maintenance of our public natural resources. *See* Commonwealth's Brief at 46. Section 1602-E merely requires the General Assembly to "consider" allocating these funds to municipalities impacted by a Marcellus well. Section 1603-E limits DCNR's allocation from the Lease Fund to "up to $50,000,000" from royalties and requires DCNR to "give preference to the operation and maintenance of State parks and forests" rather than to conservation purposes.[30] Again, however, there is no indication that the General Assembly considered the purposes of the public trust or exercised reasonable care in managing the royalties in a manner consistent with its Section 27 trustee duties.

---

[30] We reject the Commonwealth Court's re-framing of the Foundation's challenge to Section 1603-E as a contention that the General Assembly is failing to fund DCNR's mission adequately under Section 27. *See PEDF*, 108 A.3d at 161. Properly understood, the Foundation's challenge relates to whether Section 1603-E reflects the appropriate exercise of the Commonwealth's fiduciary obligations as the Section 27 trustee, not whether DCNR's budget is sufficient. *See id.* (quoting Foundation's Brief to Commonwealth Court at 93-94); *see also* Foundation's Reply Brief at 7.

We hold, therefore, that sections 1602-E and 1603-E, relating to royalties, are facially unconstitutional.[31] They plainly ignore the Commonwealth's constitutionally imposed fiduciary duty to manage the corpus of the environmental public trust for the benefit of the people to accomplish its purpose – conserving and maintaining the corpus by, inter alia, preventing and remedying the degradation, diminution and depletion of our public natural resources.[32] *See Robinson Twp.*, 83 A.3d at 957. Without any question, these legislative enactments permit the trustee to use trust assets for non-trust purposes, a clear violation of the most basic of a trustee's fiduciary obligations. *Id.* at 978 ("[T]he trustee may use the assets of the trust only for purposes authorized by the trust or necessary for the preservation of the trust; other uses are beyond the scope of

---

[31] A statute is facially unconstitutional only where no set of circumstances exist under which the statute would be valid. *Clifton v. Allegheny Cty.*, 969 A.2d 1197, 1222 (Pa. 2009) (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). "In determining whether a law is facially invalid, [a court] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *United States v. Raines*, 362 U.S. 17, 22 (1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined.")). A facial challenge "must fail where the statute has a 'plainly legitimate sweep.'" *Clifton*, 969 A.2d at 1222 (quoting *Grange*, 552 U.S. at 449).

[32] The Commonwealth avers that robust lease terms, pre-leasing analysis, and monitoring programs to discover the impacts of leasing justify the Commonwealth's appropriation of proceeds for non-trust purposes. *See* Commonwealth's Brief at 33-34. These "justifications" do not answer the question of whether it is proper for the Commonwealth to spend proceeds from those leases on anything other than "remedy[ing] the degradation, diminution or depletion" of our public natural resources. The Foundation, conversely, takes the position that there is a "backlog of projects necessary to conserve and maintain our State Forests and Parks that are estimated to cost several billion dollars." Foundation's Brief at 72. The Commonwealth's generalized assertions and the Foundation's staggering estimates do not provide any basis to determine whether the appropriations to the General Fund were made pursuant to the proper exercise of the Commonwealth's fiduciary duties as trustee. Moreover, the Commonwealth's public natural resources extend beyond the geographic boundaries of our state parks and forests.

the discretion conferred, even where the trustee claims to be acting solely to advance other discrete interests of the beneficiaries."); *see also* 20 Pa.C.S. §7780 (providing that the duty to administer a trust with prudence involves "considering the purposes" of the trust and "the exercise of reasonable care, skill, and caution"). To the extent the remainder of the Fiscal Code amendments transfer **proceeds from the sale of trust assets** to the General Fund, they are likewise constitutionally infirm.

Based on its conclusion that no revenue from the leasing and sale of trust assets is part of the corpus of the trust as well as its interpretation of Section 27's plain language, including the Commonwealth's fiduciary obligations that arise therefrom, the Commonwealth Court denied the Foundation's application for summary relief. It erroneously concluded that all of the General Assembly's transfers and appropriations from the Lease Fund were wholly proper because they appeared generally to benefit all the people of the Commonwealth and "there is no constitutional mandate that monies derived from the leasing of State lands for oil and gas development be reinvested into the conservation and maintenance of the Commonwealth's natural resources." *PEDF*, 108 A.3d at 169.

Having established, to the contrary, that all proceeds from the sale of our public natural resources are part of the corpus of our environmental public trust and that the Commonwealth must manage the entire corpus according to its fiduciary obligations as trustee, the Commonwealth Court's decision cannot stand. In light of our specific holding that sections 1602-E and 1603-E are facially unconstitutional, the pre-2008 appropriations scheme as set forth in the Lease Fund Act and the CNRA again controls, with all monies in the Lease Fund specifically appropriated to the DCNR. As to the

remaining acts and decisions the Foundation challenges, we clarify that their constitutionality depends upon whether they result from the Commonwealth's faithful exercise of its fiduciary duties vis a vis our public natural resources **and** any proceeds derived from the sale thereof. For example, the Governor's ability to override decisions by the DCNR regarding leasing is contingent upon the extent to which he does so in a manner that is faithful to his trustee obligations, not his various other obligations.

We also clarify that the legislature's diversion of funds from the Lease Fund (and from the DCNR's exclusive control) does not, in and of itself, constitute a violation of Section 27. As described herein, the legislature violates Section 27 when it diverts proceeds from oil and gas development **to a non-trust purpose** without exercising its fiduciary duties as trustee. The DCNR is not the only agency committed to conserving and maintaining our public natural resources, and the General Assembly would not run afoul of the constitution by appropriating trust funds to some other initiative or agency dedicated to effectuating Section 27. By the same token, the Lease Fund is not a constitutional trust fund and need not be the exclusive repository for proceeds from oil and gas development. However, if proceeds are moved to the General Fund, an accounting is likely necessary to ensure that the funds are ultimately used in accordance with the trustee's obligation to conserve and maintain our natural resources.

The Commonwealth (including the Governor and General Assembly) may not approach our public natural resources as a proprietor, and instead must at all times fulfill its role as a trustee. Because the legislative enactments at issue here do not reflect that the Commonwealth complied with its constitutional duties, the order of the Commonwealth Court with respect to the constitutionality of 1602-E and 1603-E is

reversed, and the order is otherwise vacated in all respects. The case is remanded to the Commonwealth Court for further proceedings consistent with this Opinion.

Justices Todd, Dougherty and Wecht join the opinion.

Justice Baer files a concurring and dissenting opinion.

Chief Justice Saylor files a dissenting opinion.

Former Justice Eakin did not participate in the consideration or decision of this case.