**[J-82-2021] [MO:Baer, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


| | | |
|---|---|---|
| PENNSYLVANIA ENVIRONMENTAL DEFENSE FOUNDATION, | : | No. 65 MAP 2020 |
| | : | |
| | : | Appeal from the Order of the |
| Appellant | : | Commonwealth Court at No. 358 |
| | : | MD 2018 dated October 22, 2020. |
| | : | |
| v. | : | ARGUED:  December 8, 2021 |
| | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| AND TOM WOLF, IN HIS OFFICIAL | : | |
| CAPACITY AS GOVERNOR OF | : | |
| PENNSYLVANIA, | : | |
| | : | |
| Appellees | : | |


**CONCURRING AND DISSENTING OPINION**


**JUSTICE WECHT**                                                **DECIDED: August 5, 2022**

Article I, Section 27 of the Pennsylvania Constitution, known as the Environmental Rights Amendment ("ERA"), created a public trust to conserve and maintain Pennsylvania's public natural resources.[1]  In *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 161 A.3d 911, 938 (Pa. 2017) (*PEDF II*), this Court struck

---

[1]  Section 27 provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, § 27.

down as facially unconstitutional certain budgetary appropriations authorizing the use of trust corpus for the general operations of the Department of Conservation and Natural Resources ("DCNR").

Shortly thereafter, the Commonwealth once again appropriated trust corpus for DCNR's general operations for the 2017 and 2018 fiscal years.[2] The Pennsylvania Environmental Defense Foundation ("PEDF") again challenged these legislative appropriations as violating the ERA. The Majority rejects PEDF's arguments and approves of the 2017 and 2018 appropriations. According to the Majority, the Commonwealth's "use of trust assets to fund DCNR's operations is within the authority of the Commonwealth as trustee to incur costs in administering the Section 27 trust, absent demonstration that these administrative costs are unreasonable or that the DCNR has failed to act with prudence, loyalty, or impartiality in carrying out its fiduciary duties."[3] I disagree. The budgetary appropriations that the Majority upholds today share the same constitutional infirmities that doomed the prior appropriations in *PEDF II*. The Majority's holding that the Commonwealth is entitled to use trust corpus to fund DCNR's general operations as a reasonable trustee expense cannot be squared with *PEDF II*.

The Majority further upholds legislation permitting the Commonwealth to commingle trust assets with non-trust assets without accounting for how trust assets are disbursed. In my view, this legislation is facially unconstitutional because it does not demand of the Commonwealth, as trustee, transparent accounting to demonstrate that its treatment of trust corpus conforms with the public trust established by the ERA.

---

[2] General Appropriations Act of 2017, Act of July 11, 2017, P.L. 1279, No. 1A, §§ 104(P), 1601; General Appropriations Act of 2018, Act of June 22, 2018, P.L. 1203, No. 1A, §§ 104(P), 1601.

[3] Maj. Op. at 18.

Accordingly, I dissent from the Majority's holding in Parts III.A, III.D, and IV. PEDF also raises a number of additional challenges that the Majority rejects in turn. I agree that these additional challenges do not warrant relief. Accordingly, I join Parts I, II, III.B. III.C, and III.E.

In 1955, the General Assembly established the Oil and Gas Lease Fund ("Lease Fund") to receive "all rents and royalties from oil and gas leases" executed on the Commonwealth's forest and park lands and to use these funds "exclusively for conservation, recreation, dams, or flood control."[4] Against this backdrop, the ERA was adopted in 1971 as part of Article I of the Pennsylvania Constitution.[5]

As we have explained, the ERA established an environmental public trust for the benefit of the people that imposes fiduciary duties upon the Commonwealth as trustee. We delineated the scope of this public trust in *PEDF II*: "The third clause of Section 27 establishes a public trust, pursuant to which the natural resources are the corpus of the trust, the Commonwealth is the trustee, and the people are the named beneficiaries."[6] The purpose of the trust is the conservation and maintenance of Pennsylvania's public natural resources.[7] The Commonwealth, as trustee, has the duty "to prevent and remedy the degradation, diminution, or depletion of our public natural resources" and to act toward the trust corpus with "prudence, loyalty, and impartiality."[8] All proceeds from the sale of

---

[4]     71 P.S. § 1331 (repealed by Act 2017, Oct. 30, P.L. 725).

[5]     *See Pennsylvania Envtl. Def. Found. v. Commonwealth*, 255 A.3d 289, 314 (Pa. 2021) ("*PEDF V*") (recognizing that the circumstances under which the trust is to be administered are relevant to determining the intent of the settlors in creating the trust).

[6]     *PEDF II*, 161 A.3d at 931-32.

[7]     *Id*. at 935.

[8]     *Id*. at 932.

trust assets remain part of the trust corpus.[9]  Trust assets can only be used for the trust purpose of conservation and maintenance of the Commonwealth's public natural resources.

When the legislature created DCNR in 1995, it provided that "all moneys" paid into the Lease Fund were appropriated directly to DCNR.[10]  Beginning in 2009, however, the General Assembly enacted budgetary legislation that transferred money in the Lease Fund to pay for government operations.  In particular, Sections 1602-E and 1603-E pertained to fiscal year 2009 and provided that money in the Lease Fund could only be expended if it was first "appropriated or transferred to the General Fund by the General Assembly," or if it was part of an annual appropriation for DCNR of $50 million. Additionally, those provisions required that preference be given not to conservation but "to the operation and maintenance of State parks and forests."[11]  In 2013, and again in 2014-2015, the General Appropriations Acts decreased the appropriation to DCNR from the General Fund and simultaneously increased the appropriation to DCNR from the Lease Fund.  This resulted "in a larger portion of monies from the Lease Fund being used to pay for DCNR's operational expenses, which had previously been funded by the General Fund, and thus reduced the amount of monies available for DCNR's conservation activities."[12]

The ERA was implicated in a series of challenges brought by PEDF to these budgetary enactments, all of which were premised upon the argument that using funds generated by the environmental trust for non-trust purposes was unconstitutional.  In

---

[9]     *Id.*

[10]     71 P.S. § 1333 (repealed by Act 2017, Oct. 30, P.L. 725).

[11]     72 P.S. §§ 1602-E-1603-E; *see also PEDF II*, 161 A.3d at 921-22.

[12]     *PEDF II*, 161 A.3d at 923; *see also PEDF V*, 255 A.3d at 294–95.

*PEDF II,* we agreed that all royalties from oil and gas leases on State forest and park lands must be returned to the trust corpus. Several years later, in *PEDF V*, this Court further held that all income generated from such oil and gas leases must be returned to the corpus to benefit the conservation and maintenance of the public natural resources for all people as a matter of trust law.

These challenges to legislative appropriations that diminished the constitutional trust established by the ERA indicated that using money in the Lease Fund for purposes unrelated to the conservation and maintenance of public natural resources violated the Commonwealth's fiduciary duties. Applying trust principles, this Court struck down as facially unconstitutional Sections 1602-E and 1603-E, concluding that "without any question, these legislative amendments permit the trustee to use trust assets for non-trust purposes, a clear violation of the most basic of a trustee's fiduciary obligations."[13] In reaching this conclusion, we observed that the legislative and executive branches had restricted the allocation of Lease Fund monies to DCNR by using the Lease Fund to support DCNR's overall budget instead of funding DCNR from the Commonwealth's General Fund, the effect of which was to reduce the amount of money available for conservation purposes.[14]

In our constitutional analysis, we repeatedly distinguished between DCNR's conservation activities and its general operations. For example, we observed that, "while the Lease Fund Act requires that the funds generated by leasing be 'exclusively used for conservation, recreation, dams, or flood control,'" Section 1603-E "designates that preference be given instead 'to the operation and maintenance of State parks and

---

[13]    *PEDF II*, 161 A.3d at 938.

[14]    *Id.* at 925; *see also PEDF V*, 255 A.3d at 294-95.

forests.'"[15] We likewise compared DCNR's "operational expenses" to its "conservation activities,"[16] and DCNR's "overall budget" to its "conservation purposes."[17] In finding Section 1603-E to be unconstitutional, we relied upon the legislation's requirement that DCNR "give preference to the operation and maintenance of State parks and forests" as opposed to "conservation purposes."[18] While the latter priority aligns with the trust purpose of conservation and maintenance of public natural resources, the former did not. Because Sections 1602-E and 1603-E of the Fiscal Code prioritized Lease Fund assets to pay for DCNR's general operations, rather than conservation, it was unconstitutional.[19] In *PEDF V*, the Court continued to distinguish "operation and maintenance" from "conservation, recreation, dams, or flood control" as well as DCNR's "overall budget" from "conservation purposes."[20]

PEDF's present challenge is levied against, *inter alia*, Sections 1601 and 104(p) of the General Appropriations Acts of 2017 and 2018, which appropriated funds from the Lease Fund to pay for DCNR's general operations. These provisions suffer from the same constitutional defects identified in Sections 1602-E and 1603-E in *PEDF II*. Each provision transferred trust assets from the Lease Fund to pay for DCNR's general

---

[15]     *PEDF II*, 161 A.3d at 922.

[16]     *Id.* at 923.

[17]     *Id.* at 925 (observing that "the Legislature began using [Lease Fund] revenue to support the overall budget of DCNR, rather than obtaining that budget money from the [G]eneral [F]und and using [Lease Fund] money for conservation purposes related to oil and gas extraction") (quoting John C. Dernbach, *The Potential Meaning of a Constitutional Public Trust*, 45 ENVTL. L. 463, 488 (2015)).

[18]     *Id.* at 937-38.

[19]     *Id.*

[20]     *PEDF V*, 255 A.3d at 294-95.

operations. The budgetary appropriations challenged herein unconstitutionally appropriate trust funds to pay for DCNR's general operating expenses to the same extent as former sections 1602-E and 1603-E. Under *PEDF II*, they should suffer the same fate.

Our analysis in *PEDF II* recognized that using trust assets to fund DCNR's general operations reduced the amount of money available to pay for conservation activities and was inconsistent with the Commonwealth's Section 27 trustee duties. The constitutional obligation to conserve and maintain "implicates a duty to prevent and remedy the degradation, diminution, or depletion of our public natural resources."[21] Using funds from the trust corpus to fund DCNR's general operations would deplete, degrade, and diminish the very public natural resources DCNR is required to conserve and maintain. Under our precedent, legislation that attempts to use the corpus of the environmental trust to fund anything other than conserving and maintaining the corpus is unconstitutional.

The Majority reads *PEDF II*'s rejection of Sections 1602-E and 1603-E as being premised upon the unrestricted transfer of trust assets to the General Fund, rather than upon the use of trust assets to fund DCNR's general operations.[22] I disagree. Woven throughout our constitutional analysis of these budgetary provisions is a repeated distinction between DCNR's conservation activities and its operational expenses. Our constitutional holding flowed directly from our recognition of this distinction.

The Majority also deems the entirety of DCNR's operational budget to amount to the costs of administering the environmental trust, for which the use of trust assets is permitted absent a showing that these costs "are unreasonable or that the DCNR has

---

[21]     *PEDF II*, 161 A.3d at 932.

[22]     Maj. Op. at 18, n.17.

failed to act with prudence, loyalty, or impartiality."[23]  Once again, I cannot agree. Whether trust corpus can be used to pay for DCNR's general operations would depend upon whether the general operations are "necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust."[24]  In *PEDF II*, we described the challenged budgetary appropriations as decreasing the appropriation to DCNR from the General Fund and increasing the appropriation from the Lease Fund to DCNR, "resulting in a larger portion of monies from the Lease Fund being used to pay for DCNR's operational expenses, which had previously been funded by the General Fund, and thus reduced the amount of monies available for DCNR's conservation activities."[25] Because those appropriations unconstitutionally used the trust corpus as a funding source to offset decreases in appropriations to DCNR from the General Fund, they were invalid under the ERA.  Deeming the entirety of DCNR's budget to be a reasonable cost of trust administration today is therefore contrary to our holding in *PEDF II* to strike fiscal code provisions that authorized the use of the Lease Fund to pay for DCNR's general operations.

The Majority shrugs away any tension between our reasoning in *PEDF II* and today's holding because the case *sub judice* presents a facial challenge.  Accordingly, the Majority explains, we do not have to determine which of DCNR's responsibilities qualify as trust purposes.[26]  I cannot agree.  In relying upon this distinction, the Majority overlooks the fact that *PEDF II* was also a facial challenge.  This Court was able there to

---

[23]     *Id.* at 18.

[24]     Restatement (Second) of Trusts § 188 (1959); Maj. Op. at 16, n.15.

[25]     *Id.* at 923.

[26]     Maj. Op. at 17, n.16.

examine the legislation, and we determined that it misappropriated trust corpus. The same is true here.

More importantly, the Majority has inverted the analysis. Because PEDF is bringing a facial challenge, this Court must address whether the challenged legislation facially permits the depletion of trust corpus for non-trust purposes. To do so, we must address what parts of DCNR's general operations are or are not related to conservation. If a portion of trust corpus is being diverted for non-trust purposes, then PEDF's facial challenge would be successful. In explicitly leaving open the possibility that trust corpus will be spent on things unrelated to the conservation and maintenance of public natural resources (which might then be struck down in an as-applied challenge),[27] the Majority is sanctioning the unconstitutional use of trust corpus for non-trust purposes. This we cannot do.

In his concurring and dissenting opinion, Justice Dougherty opines that the budgetary legislation challenged in this case is facially unconstitutional. In reaching this conclusion, Justice Dougherty observes that DCNR's responsibilities extend beyond conservation, including managing the economic use of state forests, recreation, and heritage conservation. To the extent that DCNR's general operations are broader than the trust purpose of conservation and maintenance of public natural resources, Justice Dougherty believes that using trust corpus to fund these general operations is facially unconstitutional.[28] As explained herein, I agree. In particular, DCNR's statutory duties include managing state forest lands to assure their economic use.[29] The statutory directive to exploit the Commonwealth's public natural resources for their economic use

---

[27]     *See id.* at 27.

[28]     Concurring and Dissenting Op. at 5 (citing 71 P.S. § 1340.101(b)(1)).

[29]     71 P.S. § 1340.101(b)(1).

presents an obvious conflict with the constitutional obligation to use the trust corpus solely to prevent the degradation, diminution, and depletion of these resources.

Using lease fund money to fund DCNR's general operations is constitutional only to the extent that general operations further the trust purpose of conservation and maintenance of public natural resources. Because Sections 104(P) and 1601 reflect no limitation on the use of trust corpus to fund DCNR, I would hold that they are facially unconstitutional under *PEDF II*. With these budgetary appropriations, the Commonwealth is deploying public natural resources to raise revenue and offset its obligation to fund government operations. On this basis alone, I would hold that PEDF has lodged a successful facial challenge.

The Commonwealth's obligation to fund our government exists independently from the Commonwealth's duties as trustee. "From the perspective of the settlors, the ERA was enacted when the Commonwealth was already devoting the revenues generated by mineral leases to conservation purposes."[30] Redirecting those revenues to general operations is inconsistent with the backdrop against which the ERA was enacted. A trustee's ability to use trust corpus to cover reasonable trustee expenses alleviates the expenses associated with being trustee. It does not relieve the Commonwealth of its independent obligation to fund government operations.

If the Commonwealth is permitted to use trust corpus to fund DCNR's general operations, then the public natural resources that the Commonwealth is obligated to conserve and maintain are depleted, degraded, and diminished in order to fulfill the Commonwealth's obligation to fund the costs of government. The Commonwealth would alleviate its funding obligation through its trustee duties, degrading the corpus of the same trust it has the duty to conserve and maintain. In using the corpus of the trust to replace

---

[30]     *PEDF V*, 155 A.3d at 314.

appropriations from the General Fund, the Commonwealth is failing to preserve the trust corpus for the benefit of the people and to protect their rights "to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values" of the public natural resources.[31] It is inconsistent with the Commonwealth's duty as trustee under the ERA "to conserve and maintain" our public natural resources to deplete this trust corpus to pay for DCNR's general operating costs.[32]

Although I disagree with the Majority's analysis of Sections 104(P) and 1601, I observe that the Majority does not foreclose an as-applied challenge to budgetary appropriations that are not necessary or appropriate to carry out the purpose of the trust.[33] Generally speaking, a trustee who seeks to encumber the trust with expenses incurred in maintaining and administering the trust has the burden of justifying those expenses.[34] Every expenditure must be made in accord with the terms of the trust itself.[35] The Commonwealth should not perceive a rejection of PEDF's facial challenge as approving of characterizing every expense associated with DCNR as a reasonable cost of administering the trust.

---

[31] PA. CONST. art. I, § 27.

[32] *Id.*

[33] Maj. Op. at 16 n.15.

[34] *See, e.g., In re Strickler's Estate*, 47 A.2d 134, 135 (Pa. 1946) ("Where a fiduciary claims credit for disbursements made by him the burden rests upon the fiduciary to justify them. Proper vouchers or equivalent proof must be produced in support of such credits."); *In re Union Real Estate Investment Co. First Mortgage 6% Gold Bonds Due July 1, 1941*, 1 A.2d 662, 666 (Pa. 1938) (requiring a trustee to "justify every expenditure as a proper one according to the terms of the instrument under which it is acting, or the power and authority conferred upon it"); *Mintz v. Brock*, 44 A. 417 (1899) (providing that it is the duty of the trustee to sustain the account of all moneys paid with regard to the business relating to the trust).

[35] *Union Real Estate*, 1 A.2d at 666.

I recognize that the Lease Fund at issue today is not the same Lease Fund that we evaluated in *PEDF II*. In particular, Section 1601.2-E(b) now establishes three funding sources for the Lease Fund:

> (1) Rents and royalties from oil and gas leases of land owned by the Commonwealth, except rents and royalties received from game and fish lands.
>
> (2) Amounts as provided under section 5 of the act of October 8, 2012 (P.L. 1194, No. 147),known as the Indigenous Mineral Resources Development Act.
>
> (3) Any other money appropriated or transferred to the fund.

72 P.S. § 1601.2-E(b).

The consequence of Section 1601.2-E(b), taken together with Sections 104(P) and 1601 of the General Appropriations Acts, is that trust corpus and non-trust corpus are commingled in the Lease Fund, and that expenditures from the Lease Fund are being made for trust and non-trust purposes alike. The use of non-trust corpus for non-trust purposes, even if these funds pass through the Lease Fund, is of no moment to the ERA. The ERA is violated when trust corpus is expended for non-trust purposes. To ensure constitutional compliance, the Commonwealth, as trustee, is responsible for tracking every dollar that constitutes trust corpus from the moment it is generated until the moment it is spent on conservation. The Commonwealth, therefore, violates its fiduciary duties under the ERA whenever it permits commingling without an accounting.[36]

There presently is no requirement to account for the source of dollars as they are deposited into the Lease Fund under Section 1601.2-E(b), nor to identify the purpose for which that money is spent under Sections 104(P) and 1601. Without such accounting,

---

[36] *See, e.g.,* 20 Pa.C.S. § 7780(a) (requiring a trustee to maintain "adequate records of the administration of the trust"); *id.* § 7780(b) (requiring a trustee to "keep trust property separate from the trustee's own property").

the Commonwealth fails to ensure the constitutional collection and disbursement of assets belonging to the trust. The Commonwealth presently is failing to account for the origin of the assets in the Lease Fund, to account for how Lease Fund money is spent, or to establish whether the expenses that the Commonwealth claims as a trustee are reasonable. Indeed, as the Commonwealth conceded in the Commonwealth Court, under the current state of the law, "it is not possible to identify the originating source of the total monies in the Lease Fund on a particular day."[37]

In the Commonwealth Court, PEDF sought a declaration that the Commonwealth must maintain detailed accounting of monies in the Lease Fund and how the money is used. Relying upon its own precedent in *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 214 A.3d 749 (Pa. Cmwlth. 2019), which this Court reversed in *PEDF V*, the Commonwealth Court held that money classified as trust principal must be spent on trust purposes, while money classified as income need not comply with spending restrictions.[38] By failing to account for money in the Lease Fund, the Commonwealth was, according to the Commonwealth Court, neglecting its fiduciary duties. To remedy this breach, the Commonwealth Court imposed an accounting obligation to ensure that trust assets—which, at that time, was understood solely as trust principal—are being used constitutionally.

The Commonwealth does not rely upon the current configuration of the Lease Fund to save Sections 104(P) and 1601. Nor could the Commonwealth make such an argument without an accounting to support it. Rather, like the Majority, the

---

[37] *Pennsylvania Env. Defense Found. v. Commonwealth*, 358 M.D. 2018, 2020 WL 6193643, *17 (Cmwlth. Ct. Oct. 22, 2020).

[38] *Id.* at *17.

Commonwealth argues that it is entitled to use the Lease Fund to pay for DCNR's general operations as a trustee expense related to conservation.

I am not convinced that the change wrought in the Lease Fund by Section 1601.2-E(b) warrants a departure from *PEDF II*. The lack of any accounting obligation or restriction of the use of trust assets solely for trust purposes on the part of the Commonwealth as trustee clearly, plainly, and palpably violates the Constitution. The extent to which we can evaluate the constitutionality of Lease Fund expenditures depends upon the Commonwealth's adherence to its constitutional duty as fiduciary to maintain accurate accounts of money flowing into and out of the Lease Fund, an obligation with which the Commonwealth has made no effort to comply.[39]

The possibility that only non-trust corpus in the Lease Fund is being expended upon DCNR's non-conservation activities is not plausible. As developed in the Commonwealth Court below, of the funds available in the Lease Fund to pay the $61,291,000 appropriated for DCNR's annual budget in 2017-2018, eighty-five percent was derived from royalties paid under state forest oil and gas leases, and another fourteen percent was derived from bonus and rental payments paid under those leases.[40] This

---

[39] I disagree with Justice Donohue that the lack of a statutory accounting obligation is irrelevant to the statute's constitutionality. *See* Concurring Op. (Donohue, J.), at 9, n.3. Unlike a constitutional equal protection challenge, a challenge to the constitutionality of a statute under the ERA implicates the Commonwealth's fiduciary duties "to act toward the corpus of the trust—the public natural resources—with prudence, loyalty, and impartiality." *PEDF II*, 161 A.3d at 932. Indeed, in *PEDF II*, we observed that, "if proceeds are moved to the General Fund, an accounting is likely necessary to ensure that the funds are ultimately used in accordance with the trustee's obligation to conserve and maintain our natural resources." *Id.* at 939. Because the legislation at issue in this case facially requires no accounting, it shifts the cost burden for enforcing the Commonwealth's constitutional fiduciary duties to third parties who must then find and spend funds and other resources needed to challenge the legislation in court. This is a facial violation of the Commonwealth's fiduciary duties.

[40] Section 104(P) of the General Appropriations Act of 2017 directed transfers from the Lease Fund to named agencies "for the payment of salaries, wages or other

means that ninety-nine percent of the Lease Fund was trust corpus. In 2018, the Commonwealth appropriated $48,798,000 from the Lease Fund to pay for DCNR's annual budget which, again, was almost all derived from oil and gas leases. Considering the non-conservation purposes to which this money is put (as developed herein as well as in Justice Dougherty's Concurring and Dissenting Opinion), it is not plausible that trust fund corpus is *not* being expended for non-trust purposes.[41]

To the extent that Justice Donohue believes that the Commonwealth Court's order directing the Commonwealth to maintain accurate accounts saves the budgetary legislation from facial unconstitutionality, I cannot agree. First, the legal foundation of the Commonwealth Court's order is shaky at best, tied as it is to a prior Commonwealth Court decision that this Court reversed in *PEDF V*. Second, the scope of the Commonwealth Court's order is unclear. When must the Commonwealth comply with the directive to provide an accounting? Is this a routine obligation, or is it dependent upon a third party challenge to particular disbursements? Is it prospective, or does it relate to the 2017 and 2018 budgetary legislation? Assuming that the obligation applies to the present dispute, the Commonwealth already has indicated that it is impossible for it to know from one day to the next the source of money in the Lease Fund. We cannot in good faith uphold

---

compensation and travel expenses of the duly appointed officers and employees of the Commonwealth, for the payment of fees for contractual services rendered, for the purchase or rental of goods and services and for payment of any other expenses…" Section 1601 of the General Appropriations Act of 2017 provided for the following expenditures from the Lease Fund to DCNR: $50,000,000 for general operations, $7,739,000 for state park operations, and $3,552,000 for state forest operations.

[41] Although, as Justice Donohue observes, DCNR's entire budget exceeded the transfers from the Lease Fund, *see* Concurring Op. (Donohue, J.), at 11, n.7, there is no limitation on the face of the legislation that limits the use of trust corpus to trust purposes. In this respect, I agree with Justice Dougherty that the legislative transfers from the Lease Fund in this case are facially unconstitutional to the same extent as the provisions we struck down in *PEDF II* and *PEDF V*. *See* Concurring and Dissenting Op. at 12.

legislation of apparent unconstitutionality by relying upon an unpublished, unappealed intermediate appellate court order premised upon reversed precedent with which the Commonwealth believes it cannot comply.

Third, attempting to save the challenged legislation from a facial challenge by linking the statutes to the Commonwealth Court's order implicitly recognizes that the statutes, on their face, clearly, plainly, and palpably violate the constitution. The statutes as they stand do not comport with the constitutional fiduciary requirement of an accounting.

Fourth, in rejecting the present facial challenge, the Majority and Justice Donohue favor shifting any claims of unconstitutionality to as-applied challenges based upon whatever accounting the Commonwealth believes it must comply. This is untenable. The ERA imposes fiduciary obligations upon the Commonwealth of constitutional magnitude. These obligations make the Commonwealth accountable, as trustee, to track and disclose every dollar of trust corpus. Without this obligation appearing on the face of the legislation itself, Section 1601.2-E(b)cannot withstand constitutional scrutiny. Rejecting this facial challenge shifts to third parties such as PEDF the expense and burden of sifting through the Commonwealth's accounting in order to lodge as-applied challenges to particular disbursements. Relying upon third parties to monitor the Commonwealth's compliance with its constitutional obligations is no substitute for judicial review of unconstitutional statutes.

The result of the Majority's analysis is the unavoidable degradation, diminution, and depletion of the constitutional trust corpus. Because trust assets return to the trust corpus and cannot be used for non-trust purposes, I dissent from Parts III.A, III.D, and IV of the Majority Opinion. I join Parts I, II, III.B, III.C, and III.E.